UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>PHILIP GOODWIN,<br><br>Defendant | Crim. No. 17-10209-NMG |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by its attorneys, United States Attorney Andrew E. Lelling, and Assistant U.S. Attorneys David J. D'Addio and Amy Harman Burkart, respectfully submits this memorandum in advance of the sentencing hearing scheduled for March 29, 2018.

Philip Goodwin was one of the two leaders of a counterfeit steroid organization that operated for years, selling millions of dollars in steroids, most of which Goodwin produced from raw steroid powder he sourced from internet vendors in China. He packaged these goods using counterfeit labels bearing the registered marks of a legitimate, global pharmaceutical company, providing his customers with indicia of quality, sterility, and safety belied by the fact that he manufactured and packaged the steroids—injectable pharmaceuticals—in his kitchen and basement, often while high on heroin. Goodwin, co-coconspirator Tyler Bauman, and others, distributed the home-brewed drugs to customers across the country. They deployed a small network of individuals to pick up customer payments using fake identification documents (also sourced from China via the internet) at money remitters such as Western Union and MoneyGram. They paid co-conspirators to ship the counterfeit steroids through the U.S. Postal Service, and laundered some of the proceeds through a tanning salon Goodwin and Bauman

1

owned, but where little tanning occurred. They operated for years in a calculated and brazen manner, confident that they would escape serious punishment.

For the reasons set forth below, and based upon consideration of the advisory guidelines sentencing range ("GSR") and all of the sentencing factors identified in 18 U.S.C. § 3553(a), the government respectfully recommends that the Court impose a sentence of 168 months' incarceration—the low end of the GSR as calculated by the government and the U.S. Probation Office—to be followed by a 36-month term of supervised release.

**I.  Background**

On November 29, 2017, Goodwin pleaded guilty each of five counts in the above-captioned indictment, charging: (1) conspiracy to distribute counterfeit testosterone, trenbolone, and other steroid compounds that are Schedule III controlled substances in violation of 18 U.S.C. § 371; (2) conspiracy to traffic in counterfeit drugs in violation of 18 U.S.C. § 371; (3) conspiracy to launder money in violation of 18 U.S.C. § 1956(h); (4) possession with intent to distribute controlled substances in violation of 21 U.S.C. § 841; and (5) trafficking in counterfeit drugs in violation of 18 U.S.C. § 2320. Dkt. Nos. 82-83. A summary of the organization Goodwin led and the roles of the charged participants is provided below.

*A. The Onyx Counterfeit Steroid Organization*

Goodwin's conduct is not in dispute and is summarized accurately (along with relevant aspects of his co-conspirators' conduct) in the Presentence Report ("PSR") at paragraphs seven through 45. The Onyx Counterfeit Steroid Organization began manufacturing steroids using the "Onyx" label beginning in at least May 2015 and continuing until April 2017. PSR ¶ 11. Tyler Baumann and Phillip Goodwin were the co-leaders of the organization. PSR ¶ 16. Goodwin ordered both the raw materials for the injectable steroids and the labels and packing bearing the Onyx trademarks from overseas suppliers. PSR ¶ 11, 16. Goodwin then manufactured and

packaged the Onyx steroids at his home, which he shared with his girlfriend and four children. *Id.* While the Onyx-branded steroids were all injectable steroids, Baumann and Goodwin also obtained and sold other steroids in pill form ("orals"). PSR ¶ 12.

Baumann marketed the Onyx products on social media, primarily Instagram, and arranged for the sale of the products using email. PSR ¶¶ 11, 14. Customers paid for the steroids via money remitters such as Western Union and MoneyGram. *Id.* Baumann and Goodwin directed other members of the conspiracy to ship steroids to customers and collect the proceeds. PSR ¶ 11, 14, 16. The members of the conspiracy who collected the illicit customer payments used false identifications and multiple remitter locations to attempt to avoid suspicion while picking up the significant proceeds of the organization. PSR ¶ 11.

Goodwin and Baumann also conspired with Melissa Sclafani to launder the illicit funds of the organization. Together, Baumann and Goodwin were co-owners of a tanning business in Beverly, Mass., called Wicked Tan LLC ("Wicked Tan"). PSR ¶ 16. Sclafani operated Wicked Tan, and assisted Baumann and Goodwin in using the business to hide proceeds of the illegal activity, by creating the impression that the money was revenue generated by the tanning business. PSR ¶ 44-45.

> B. *Goodwin and Baumann Divided Responsibility, with Baumann Promoting the Organization and Handling Orders, and Goodwin Manufacturing the Steroids and Handling Inventory.*

Baumann managed critical logistical aspects of the operation and was the primary driver of the marketing of the Onyx steroids. Baumann created and cultivated a social media presence, using the persona "musclehead320," on a number of platforms. PSR ¶ 15. As "musclehead320," Baumann claimed to be "sponsored" by Onyx, and promoted the effectiveness of the product. *Id.* At the same time, Baumann created and posted on Instagram accounts dedicated to the marketing and sale of the Onyx products, including "onyx_roid" and "onyxpharma." *Id.* These Instagram

3

accounts directed potential buyers to email accounts operated by Baumann, to place their orders. Baumann directly coordinated with Robert Medeiros, the primary shipper of the steroid products, to send the steroids to customers across the country. PSR ¶¶ 14, 36-38. Each week, Medeiros provided Baumann with a tally of his earnings, ($10 per package shipped) and Baumann provided cash to Kathryn Green (Baumann's fiancée) to pay Medeiros. *Id.* at ¶ 38.

Goodwin, in turn, handled the manufacturing and packaging of the steroids for distribution. He determined what supplies and equipment were needed to manufacture the steroids and either ordered the equipment himself or directed other members of the conspiracy to do so and provide it to him. PSR ¶ 43. He provided the finished Onyx steroids to shippers such as Medeiros and Brian Petzke for distribution to customers throughout the country and sometimes directed these shippers' activity. PSR ¶ 34, 38. He also sometimes received steroid proceeds from the co-conspirators who picked up money that customers sent via Western Union and MoneyGram. PSR ¶ 35. On April 12, 2017, law enforcement agents searched Goodwin's home pursuant to a search warrant. Agents seized approximately 5.55 kilograms of raw steroid powder (Goodwin admitted that the substance was steroid powder); 78 vials of prepared steroids (again, confirmed by Goodwin); more than 13,000 Onyx packages and labels for yet-to-be produced steroids; and approximately $281,000 cash that Goodwin admitted was steroid proceeds. PSR ¶ 19. Images of some of the packaging and manufacturing equipment and supplies seized from his home are depicted below.

 

*Figures 1(left) and 2 (right): "Onyx" packaging seized from Goodwin's residence*



*Figure 3: Steroid powder and other steroid manufacturing equipment stored in an oven at Goodwin's residence.*



*Figure 4: Additional manufacturing supplies stored in an oven at Goodwin's residence.*

The organization was long running, national in scope, and very profitable. PSR ¶ 11, 12. The sale of the Onyx-branded products alone exceeded $1.5 million dollars. *Id*. Based on the estimates of co-conspirator Baumann, the Onyx sales (injectable steroids) represented half of the business; the other half was oral steroids (pills). By any estimate, the Onyx Steroid Organization was a multi-million dollar illegal steroid enterprise.

*C. The Status of other Members of the Conspiracy*

On April 12, 2017, pursuant to a criminal complaint, six members of the conspiracy were arrested: Goodwin, Baumann, Kathryn Green ("K. Green"), Sclafani, Medeiros and Petske. Ultimately, only Goodwin and Petske were indicted; the remaining defendants each pleaded guilty to Informations. Later, Elizabeth Green, Katheryn Green's sister, also pleaded guilty to an Information for her role in picking up proceeds from money remitters.

The charges against each of the defendants in related cases is listed in the PSR at Paragraph 6. On March 15, 2018, this Court sentenced K. Green to 12 months and one day of custody, followed by two years of supervised release. PSR ¶ 6; (17-CR-10210-NMG). Later that day, Judge Woodlock sentenced Baumann (who pleaded guilty to an Information charging the same offenses charged in the above-captioned Indictment) to 10 years of incarceration, followed by three years of supervised release. PSR ¶ 6; (17-CR-10211-DPW). Co-conspirators Sclafani, Medeiros, Petzke, and Elizabeth Green have not yet been sentenced.

**II.     Advisory Guidelines Sentencing Range**

The government agrees with the Probation Office's calculation of the guidelines sentencing range, described in the PSR at Paragraphs 46-61 and 122, and summarized below:

Base offense level (USSG § 2B5.3(a))                                                              + 8

Adjustment for Loss Between $1,500,000 and $3,000,000 (USSG § 2B5.3(b)(1))   +16

Adjustment for importation of infringing items (USSG §2B5.3(b)(3))                    +2

| | |
|---|---|
| Adjustment because the offense involved a counterfeit drug (USSG § 2B5.3(b)(5)) | +2 |
| Increase for conviction under 18 U.SC. § 1956 (USSG § 2S1.1(a)(1)) | +2 |
| Adjustment for being an organizer/leader with five or more participants | +4 |
| Adjustment for Obstruction of Justice (USSG § 3C1.1) | +2 |
| **Adjusted Offense Level** | **36** |
| Adjustment for acceptance of responsibility (USSG § 3E1.1(a) and (b)) | <u>-3</u> |
| **Total Offense Level** | **34** |

As described in the PSR, Goodwin's Criminal History Category is III. PSR ¶ 122. As a result, the resulting Guideline Sentencing Range (GSR) is **168-210 months**.

### A. The Two-Point Enhancement For Obstruction of Justice Is Appropriate.

Defendant disputes only the applicability of the obstruction enhancement. Sentencing Guidelines § 3C1.1 calls for a two-point enhancement if the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction." The application notes provide examples of "covered conduct" (App. Note 4) as well as examples of conduct "ordinarily not covered" (App. Note 5) by USSG § 3C1.1. Among the examples of conduct that constitutes obstruction is "escaping or attempting to escape from custody before trial or sentencing." USSG § 3C1.1, App. Note 4(E). Following his arrest, Goodwin was ordered to "complete an inpatient drug treatment program, and return to the court for further hearing." PSR p. 41 (USPO Resp. to Obj. #3); Dkt. No. 24. Defendant absconded from the inpatient treatment program and was arrested one month later by the U.S. Marshals Service at a motel in Danvers, Mass. The definition of "custody" for Sentencing Guidelines purposes is broader than incarceration and extends to "[w]alking away from a drug treatment facility, where the defendant was ordered to reside as a condition of his pretrial release," *United States v. Hernandez-Olivares*,

7

21 F. App'x 807, 809–10 (10th Cir. 2001). *See also United States v. Ray*, 772 F.3d 824, 824-25 (8th Cir. 2014) ("By absconding from the drug treatment facility in violation of his pretrial release conditions, [the defendant] escaped 'from custody' within the meaning of U.S.S.G. § 3C1.1.). That the defendant chose not to go very far, whether because he lacked resources or desire to do so, makes the act no less "willful." Defendant notes that the First Circuit has not yet resolved whether the enhancement requires a further showing of "specific intent." *See* PSR, p. 40-41 (Objection #3). Even assuming that the Court must find "specific intent" to impede the prosecution, there is sufficient evidence for this Court to do so. Goodwin fled from a court-ordered, in-patient drug treatment and remained a fugitive for a month. He never attempted to contact Pretrial Services. He showed no intention of ever returning to court. The standard is a mere preponderance of the evidence, and "[i]n determining the intent with which a defendant acted, the district court is entitled to rely on circumstantial evidence and on all the reasonable inferences that may be drawn from the evidence," *United States v. Cameron*, 2014 WL 5323396 at *16 (D. Me. Oct. 27, 2014), aff'd, 835 F.3d 46 (1st Cir. 2016) (internal citation and quotation marks omitted).

The government acknowledges that Goodwin's attempt to impede the prosecution was caused in part by his persistent heroin addiction. Accordingly, the government continues to recommend the three-point reduction for acceptance of responsibility under USSG § 3E1.1.[1]

---

[1] The government notes that under USSG § 3E1.1 Application note 4: "Conduct resulting in an enhancement under §3C1.1 (Obstructing or Impeding the Administration of Justice) ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct." However, the application note states that there may nonetheless "be extraordinary cases in which adjustments under both §§3C1.1 and 3E1.1 may apply." Given the totality of the circumstances, the government believes this is among the cases where both the obstruction enhancement and acceptance-of-responsibility reduction should apply.

### III. FACTORS SET FORTH IN 18 U.S.C § 3553(a)

  A. *The Onyx Steroid Organization Deliberately Exploited the Intellectual Property of a Legitimate Pharmaceutical Company to Advance its Counterfeit Steroid Sales*

  Goodwin argues that the GSR is excessive because it is driven by the counterfeiting offense, when the case is more properly viewed as a steroid manufacture/distribution case. PSR p. 41-42 (Objection #5). Baumann raised a similar argument in advance of his sentencing. Goodwin notes that Onyx Pharmaceuticals did not make anabolic steroids, and thus the sales of "Onyx" steroids did not displace company sales. The government does not dispute this fact. But the government disagrees that this case would fundamentally be the same regardless of whether Baumann and Goodwin chose to use the Onyx trademarks or had simply called the steroids "Tyler and Phil's Steroids" and sold them without logos or holograms. Baumann and Goodwin used the Onyx trademarks because doing so aided in the marketing and sale of their products. With the marks, the products looked professional, they looked safe, and they looked like they had been made in a real facility—not the residential home where Goodwin, a heroin addict, lived with his girlfriend and four children.

  Below are photographs from the "onyx_roid" and "onyxpharma" Instagram accounts posted by Baumann, showing the measures that were taken to make the product appear legitimate, including using the Onyx trademarks, holograms, legitimate packaging, and creating "Lot Numbers":

9



*Figure 5: "Onyx" product advertised on "onyx_roid" Instagram account.*



*Figure 6: "Onyx" product advertised on "Onyxpharma" Instagram account.*

There is no dispute that these "Onyx" steroid products clearly display the Onyx name and other trademarks, as outlined in the Indictment. In his objections to the PSR, Goodwin (like Baumann) essentially argues that it should not matter, because it did not result in economic loss to the trademark holder. But Goodwin's argument fails to account for another purpose of the criminal copyright infringement statutes: protection of the health and safety of the American

consumer. The professional labels and logos that appeared on the Onyx packages were examples of the types of marks that consumers look for—these features signal that the drug has been created in a controlled, regulated environment.

When someone takes advantage of the trust built by the company and the regulatory system to make an illegal profit, it is not only a serious crime, but it can also be a dangerous one. It was in recognition of this harm that in July 2012 the federal statute that criminalized trafficking in counterfeit goods, 18 U.S.C. § 2320, was amended to add a specific provision for trafficking in counterfeit drugs. The amendment both provided for a higher maximum penalty for this specific subsection of the statute and called for the creation of a sentencing enhancement under the guidelines. The use of counterfeit marks in the marketing and sale of drugs implicates significant health and safety concerns. The statute and associated guidelines provision were specifically intended to deter that harm.

> B. *Goodwin Should Receive A Sentence Proportional To That Imposed On Co-Leader Baumann.*

In sentencing Goodwin, this Court is not drawing on a blank slate. Baumann, who led the conspiracy with Goodwin, was sentenced on March 15, 2018 to 120 months' incarceration by Judge Woodlock. This Court should consider that sentence and the reasons for its imposition in fashioning a proportionate sentence for Goodwin.

If not for Goodwin's obstruction-of-justice enhancement, his and Baumann's offense level calculations would have been identical. Likewise, both defendants had a total number of criminal history points placing them in Criminal History Category III (Goodwin had five criminal history points; Baumann had four). Baumann, however, qualified as a career offender based on two prior drug-trafficking convictions. For equitable reasons, the government recommended a sentence of 135 months for Bauman, which constituted the low end of the GSR

without the career-offender "bump" in criminal history category (the career offender guideline had no impact on Baumann's offense level).[2]

The culpability of these defendants is nearly identical. Baumann was the marketing engine of the enterprise, and Goodwin may well contend that the enterprise would have floundered without him. On the other hand, Baumann has taken the position that he lacked the skills, know-how, and desire to manufacture steroids at scale, and that without Goodwin, he would have remained at most a steroid user and small-time dealer. The court need not resolve the matter because the record makes clear that they were *both* essential to the enterprise. They both shared decision-making authority. As Baumann explained in a text message he sent to Sclafani on April 9, 2017: The organization "is me and phil[.] [Y]ou work for us. We call the shots."

### C. The Court Should Impose a Significant Term of Incarceration to Deter Goodwin and Others from Committing Similar Crimes

Goodwin appears to have grown up in a stable and supporting environment. He reports that his family suffered no financial hardships. PSR ¶ 77. His family continues to provide support, and significantly, is caring for his children. PSR ¶ 81. Goodwin earned a degree in electrical engineering, and has been able to maintain meaningful and profitable employment with that degree. PSR ¶ 109-110, 112. His long and varied history of drug abuse has without question contributed to his criminal history, but it neither explains nor excuses the depth and duration of his criminal activity.

---

[2] But for recent changes in the definition of a "crime of violence," Goodwin would have qualified as a career offender, like Baumann. Had Goodwin been classified as a career offender under these circumstances, the Government would have sought a similar variance and recommended a sentence without the "bump" in criminal history category.

Goodwin's decision to organize and lead a steroid-trafficking organization was made after multiple drug-related convictions and two convictions for armed robbery for which he was sentenced to serve two-and-a-half years in prison. He was not deterred from actively engaging in a criminal enterprise, and leading others in the same activity. Rather, he appears to have made the calculated choice that making and selling steroids was less risky than other types of criminal behavior. In order to deter further criminal activity upon his release, Goodwin needs to serve a significant term of incarceration for these offenses.

Moreover, others in both the steroid industry and those who seek to sell counterfeit drugs need the clear message that such crimes will be met with terms of incarceration. Baumann, and others in the organization, have expressed directly their surprise at the charges and potential consequences. This is especially true where it is relatively easy for an individual to commit this crime. Anyone with internet access and a desire to do so has the ability to order pills, labels, packaging, raw materials, and other supplies from overseas to create and sell counterfeit drugs. Those considering following Goodwin's example should be shown that the consequences of his crimes were significant. *See generally United States v. Martin,* 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are more rational, cool and calculated then sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence") (internal quotation omitted). A significant term of incarceration is appropriate to reflect the harm that Goodwin has caused and to serve as both a specific deterrent to him and a general deterrent to others that contemplate marketing and manufacturing counterfeit drugs.

## CONCLUSION

For the above reasons, the government asks the Court to impose on Goodwin a 168-month term of incarceration, to be followed by a 36-month term of supervised release, and forfeiture as noted in the plea agreement.

                                    Respectfully submitted,

                                    ANDREW E. LELLING
                                    United States Attorney

                            By:     /s/ David J. D'Addio
                                    David J. D'Addio
                                    Amy Harman Burkart
                                    Assistant U.S. Attorneys

Dated:  March 26, 2018

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

>  */s/ David J. D'Addio*
> David J. D'Addio
> Assistant United States Attorney

Date:  March 26, 2018